**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| DARNELL LAMAR HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CV418-040 |
| | ) | |
| AARON MCKIE, JOHN P. MORRIS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

*Pro se* plaintiff Darnell Harris, an inmate at Chatham County Detention Center (CCDC), alleges in his 42 U.S.C. § 1983 Complaint that he was subjected to excessive force and that his right to due process was violated. Doc. 1 at 5-6. The Court granted Harris' request to pursue his case *in forma pauperis* (IFP), doc. 3, and he returned the necessary forms. Docs. 4 & 5. The Court now screens the Complaint pursuant to 28 U.S.C. § 1915A.[1]

[1] During the early screening required by § 1915A, the Court must identify "cognizable claims" in the prisoner's complaint and dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.

Because the Court applies Fed. R. Civ. P. 12(b)(6) standards in screening a complaint pursuant to § 1915A, *Leal v. Ga. Dep't of Corr.*, 254 F.3d 1276, 1278-79 (11th Cir. 2001), allegations in plaintiff's Complaint are taken as true and construed in the light most favorable to him. *Bumpus v. Watts*, 448 F. App'x 3, 4 n.1 (11th Cir.

## I. BACKGROUND

Harris' complaint sets out the following factual claims. A recently released "convicted felon," Harris was meandering around downtown Savannah just before midnight on July 7, 2017. Doc. 1 at 3, 5. Apparently, a report that two women had just been robbed at gun point in the downtown Savannah area "by a tall black male" in a "polo shirt, hat, [and] jeans" had been made to the Savannah Police Department (formerly the Savannah Chatham Metropolitan Police Department (SCMPD)). *Id*. at 5.[2] As responding officers combed the area, Harris (a "young black male" just "minding his own business") happened to be walking home. *Id*. A "smoke grey car" approached, "suspiciously swerve[d]," and then made an "illegal u-turn" to point at Harris. *See id*. He stopped walking and the car window rolled down just enough "for a gun to point[ ] at [him]." *Id*. Harris, fearing for his safety, "took off running," but he froze when he heard a voice tell him to stop running or else he would be shot in the back. *Id*. It was only then that he realized that the person in the car was an officer. *Id*.

---

2011). Conclusory allegations, however, fail. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing a Rule 12(b)(6) dismissal).

[2] It is unclear where Harris learned about the reported description of the robbery suspect. *See* doc. 1 at 5-6.

During Harris' takedown, Detective Morris allegedly "threw his knee obsessively [*sic*] to [Harris'] leg numerous times and to his lower back area." *Id.* Harris asserts that Morris also hit him in the side and back of the head with the butt of his service weapon "relentlessly," claiming he was doing so to hold Harris down even though Harris believes he "wasn't even resisting arrest" and was never charged with resisting arrest. *Id.* at 6. Harris complains that none of the "SCMPD or task force" officers also present interfered to stop Detective Morris' "police brutality." *Id.*

Detective Aaron McKie, having come on the scene at some point, then conducted an "illegal show up." Doc. 1 at 6. While the transport officer held up a cuffed Harris, the robbery victims were brought over to identify him. *Id.* Detective McKie then "falsified statements under oath[ ]" by at some point claiming he had no knowledge of Harris being injured, only that he had complained of "head pains." *Id.* Since he was the one who ordered the transport officer to escort Harris to Memorial Medical Center, Harris reasons that this cannot be true. *Id.* Harris asserts he has "abrasions to the right temporal area, facial contusions, lower back sprain" and states that he has been on "medicine for pain

since July 8, 2017." *Id*. Harris wants the Court to award him $3.5 million in damages "for the acts of police brutality," "due process of law," and "perjury." *Id*. at 7.

## II. ANALYSIS

Liberally construed, Harris' Complaint asserts an excessive force claim against Detective Morris for his actions during the arrest, as well as against the unidentified "SCMPD or task force" agents who failed to stop Morris' unjustified attacks. He also raises a due process claim against Detective McKie for conducting an "illegal show up" and making false statements under oath. *See* doc. 1 at 5-6.

### A. Excessive Force

Harris' claims against Detective Morris for excessive force in violation of the Constitution, and against the unidentified "SCMPD or task force" agents[3] for failing to intervene in the beating, can proceed to

---

[3] Generally, fictitious party pleading is not permitted in federal court. *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). There is a difference, however, between a claim against fictitious parties and a claim against real parties sued under a fictitious name. *See Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992). A claim against an unnamed defendant (or "John Doe" or "Jane Doe") may therefore proceed when the plaintiff's description of the defendant is sufficiently specific that they may be identified for service even though an actual name is unknown. *See id.* In such cases, the allegations in the complaint must make it clear that the plaintiff can uncover the defendant's name through discovery. *See id.*; *see also Bowens v. Superintendent of Miami South Beach Police Dep't*, 557 F. App'x 857, 862 (11th Cir. 2014) (per curiam) ("[A] claim may be maintained against unnamed defendants

service. To allege excessive force by an officer in the course of executing an arrest, a plaintiff must assert that the officer's conduct was objectively "unreasonable." *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). Such a test looks not to the motivation of the particular officer but instead examines whether a reasonable officer would have taken the same action under the circumstances. *Id.* at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotes and cites omitted).

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of a precise definition or mechanical application," . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (cites omitted). The Court examines "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the

---

where allegations in the complaint make clear the plaintiff could uncover the names through discovery."). Here, it appears likely that the agents' identities could be discovered through a review of the arrest report or other discovery propounded on the named defendant.

attendant circumstances and facts, and balanc[es] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)). "Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016); *see also Scott*, 550 U.S. at 383 (observing that in determining whether the Fourth Amendment was violated, "we must still slosh our way through the factbound morass of 'reasonableness.'"). Here, Harris alleges that he was compliant but Detective Morris beat him anyway, to the point where he had to be taken to emergency care, and that the other agents failed to intervene stop the beating.[4] That is enough, at this stage, to warrant a response.

**B. False Statements**

As to Detective McKie's "false statement" covering for Detective Morris (that "he had no knowledge of Harris being injured only making complaints of head pain"), it is unclear that the statement was actually

4 "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) (collecting cases).

false. Doc. 1 at 6. After all, Harris specified that Detective McKie conducted the "show up" sometime later, but it is not obvious he was present for the beating given by Detective Morris. *See id.* Even then, it is unclear what constitutional violation Harris believes arose from the statement that Detective McKie only knew that Harris had complained of head injuries and thus sought medical care for those head injuries. The statement certainly was not used to gin up probable cause to arrest or falsify the events in a report to manufacture charges, such as would support a claim for false imprisonment or malicious prosecution. *See id.* (emphasizing that he hasn't been charged with "resisting arrest"). A false statement not causally connected to some discernible harm does not give rise to a constitutional claim. *See, e.g., Landrigan v. City of Warwick*, 628 F.2d 736, 745 (1st Cir. 1980) ( "For purposes of recovering damages at least, we do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.").[5] The Court cannot divine

[5] While the Court cannot *ex ante* foreclose the possibility that some § 1983 claim could arise from a false statement made in a police report that resulted in no discernible injury, the Court also cannot create out of wholecloth a general right to have the truth told in a police report. "The focus" in § 1983 cases "should be on the consequences, if any, not on the mere existence of the report. . . . [T]he mere filing of the false police reports, by themselves and without more, d[oes] not create a right of

what injury Harris suffered, much less conclude that he has mustered anything approaching a claim to relief.[6]

### C. Due Process

Harris finally contends that the "showup" organized by Detective McKie was unconstitutional, doc. 1 at 6, undercutting, perhaps, the probable cause to effectuate his arrest and attacking the validity of the prosecution against him.[7] He seeks money damages for his allegedly

---

action in damages under 42 U.S.C. § 1983." *Landrigan*, 628 F.2d at 745.

[6] Harris may ponder whether Detective McKie said he lacked direct knowledge of any injury to protect Detective Morris. A civil rights conspiracy consists of "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damages." *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979). Although conspiracy claims are actionable under § 1983, "it is necessary that there have been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws." *Landrigan*, 628 F.2d at 742. And Harris has alleged neither an agreement between the detectives nor an actual deprivation of a right secured by the Constitution. The Court will therefore not read into his Complaint any attempt at leveling a civil conspiracy claim against Detective McKie.

[7] A damages action that impugns the validity of an ongoing prosecution usually must be stayed pending the disposition of that claim before the state court. *See Heck v. Humphrey*, 512 U.S. 477, 487 n. 8 (1994) ("[I]f a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel state-court proceedings."); *Younger v. Harris*, 401 U.S. 37, 53 (1971) (federal courts must abstain when adjudication of a litigant's claims would interfere with pending state criminal proceedings, provided that the party seeking federal relief has an adequate remedy at law and has not shown that he will suffer irreparable injury); *Doby v. Strength*, 758 F.2d 1405, 1405-06 (11th Cir. 1985) (requiring abstention pursuant to *Younger* where plaintiff raised § 1983 damages claims related to ongoing state criminal proceedings). Here, plaintiff seeks monetary, not injunctive, relief, but his claim nonetheless falls

unlawful showup, and the Prison Litigation Reform Act (PLRA) precludes a prisoner from recovering compensatory damages "for constitutional violations [occurring in custody] unless he can demonstrate a (more than *de minimis*) physical injury." *Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015); *see also* 42 U.S.C. § 1997e(e). The damages exclusion extends to injuries suffered "during custodial episodes, even if such custody occurred outside prison walls." *Napier v. Preslicka*, 314 F.3d 528, 533 (11th Cir. 2002). Non-physical injuries suffered because of an invalid arrest occur "in custody." *Napier*, 314 F.3d at 533-34; *see also Napier v. Preslicka*, 331 F.3d 1189, 1195-96 (11th Cir. 2003) (Barkett, J. dissenting) (noting that the *Napier* panel's interpretation of § 1997e(e) would limit prisoners' recovery for, *inter alia*, even "humiliating, torturous, or otherwise illegal pre-detention searches and interrogations").

As previously explained by this Court:

---

firmly within the purview of *Younger*. His allegations concerning improper showup procedure relate directly to the basis for his pending criminal charges -- the eyewitness identification -- and any ruling by this Court as to those claims could substantially interfere with the results reached in the state court proceeding unless the matter is stayed. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003) (noting the importance of "whether the federal proceeding will interfere with an ongoing state court proceeding" in determining whether *Younger* abstention is appropriate). But the Court need not stay the case pending the resolution of his state criminal case, because it must be dismissed under the PLRA.

It may seem startling that the PLRA precludes a prisoner's recovery of anything beyond nominal damages, even for the most egregious (albeit non-physical) constitutional violations. But *Napier* interpreted § 1997e(e)'s damages limitation to apply to any injury suffered "in custody," as that term is understood after *Miranda*. That includes "any situation in which a reasonable individual would feel a restraint on his movement such that he would not feel free to leave." *Napier*, 314. F.3d at 532-33. Hence, it includes many Fourth Amendment violations.

*Napier*'s facts underscore that holding's breadth. Napier's *brother* had been issued a trespass warning. *Id.* at 531. But two years later, the police arrested Napier himself for trespass, in violation of that warning, even though Napier produced valid identification, and pointed out the arresting officers' mistake. *Id.* "Later, *while imprisoned on a separate offense*," Napier filed a § 1983 action against the arresting officers for "embarrassment and mental anguish" from the Fourth Amendment violation. *Id.* (emphasis added). The *Napier* panel reasoned that, if Congress had intended to limit the PLRA's application to claims arising during the plaintiff's imprisonment, it could have relied on the more restrictive statutorily-defined term "prisoner" to express the statute's scope. *Id.* at 532. But it didn't. So "in custody" had to be read with its "settled legal meaning," as established by *Miranda* and its progeny. *Id.* Thus, "the PLRA should apply to prisoner lawsuits that claim injuries suffered during custodial episodes, even if such custody occurred outside prison walls." *Id.* at 533.

The connection between Napier's injury and his incarceration was even more attenuated, however -- his incarceration at the time he filed suit was on an unrelated charge. That didn't matter. Because "in custody" is unqualified, it refers to any custodial episode. *Id.* (explaining "Congress could have drafted the statute to say 'while thus imprisoned' or 'while in that custody' or 'during the aforementioned confinement to specifically tie the clause in question to the antecedent . . ..") Moreover, a broad reading of "in custody" supports PLRA's purpose:

> [p]ractically, the problem of frivolous lawsuits filed by

> prisoners is not limited exclusively to those lawsuits dealing with conditions of confinement. The natural target of a prisoner's litigious aggression is the government, and, as in this case, the vectors for such aggression are not limited to lawsuits challenging prison conditions. Rather, prisoners have cause and opportunity to file frivolous complaints concerning the range of alleged slights imposed on them by the government during their custodial episodes, both past and present, both in prison and in the back seat of a police car.

*Id.* at 534.

Although the remedies are limited, the Eleventh Circuit's construction of the PLRA does not foreclose the vindication of any prisoner's constitutional rights. First, and most clearly, § 1997e(e) is limited by its plain terms to "Federal action[s]," leaving open the possibility of a state-law action in state courts seeking an otherwise available remedy. 42 U.S.C. § 1997e(e). *Cf. Rose v. Lundy*, 455 U.S. 509, (1982) (noting in the context of requirement to exhaust state habeas remedies before seeking federal relief, that "[u]nder our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution." (internal quotes, cite, and alteration omitted)). Second, *Brooks* makes clear that nominal damages are always available for constitutional violations, regardless of physical injury. 800 F.3d at 1308 (explaining nominal damages function to recognize the violation of rights). Finally, *Napier* suggests that the running of the statute of limitations might be equitably tolled while the application of the PLRA precluded suit. *See Napier*, 314 F.3d at 534 n. 3 ("The Eleventh Circuit has not yet been faced with a case that involves a prisoner's claim that is both barred by the PLRA during imprisonment and barred by the applicable statute of limitations after release from prison, thereby giving the plaintiff no opportunity to ever have his claim heard on the merits by a federal court. We proffer, but do not hold, as that issue is not before us, that such a result may be mitigated by the doctrine of equitable tolling . . . .").

*Green v. Talley*, CV416-285, doc. 8 at n. 1 (S.D. Ga. May 5, 2017).

Harris was detained when he filed his Complaint, so it is subject to the PLRA. Doc. 1 at 3, *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015) ("42 U.S.C. § 1997e, which is designed to deter the filing of frivolous litigation against prison officials, applies to both pretrial detainees and convicted prisoners."). He does not allege any (even *de minimis*) physical injury resulting from his allegedly illegal showup, which also occurred while he was in custody. *See id.* at 5-6. Thus, the PLRA precludes his compensatory damages claim for any unlawful showup.[8]

## III. CONCLUSION

Accordingly, Harris' due process and false statement claims should

[8] Nor does he allege enough facts to support a nominal damages claim. *See Brooks*, 800 F.3d at 1308 (PLRA-subject claims that do not involve physical injury are limited to nominal damages). To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification. *Neil v. Biggers*, 409 U.S. 188 (1972). A mere "showup," without more, does not violate due process. *Id.* at 189. Harris does *not* approach alleging a suggestive or unreliable identification procedure. The victims had already thoroughly described the man that robbed them to police before seeing Harris (indeed, it was their description that led to his seizure), they were permitted a close examination of Harris (within "2 ft") within an hour of his seizure, and they positively identified Harris while their memories were still fresh. Doc. 1 at 6; *compare Biggers*, 409 U.S. at 199; *see also Foster v. California*, 394 U.S. 440, 443 (1969) (only if the identification procedure is structured so that the victim's identification of a certain defendant is "all but inevitable," is the reliability of the identification so undermined that due process is violated). Since he has failed to plead sufficient facts to support his claim, even limited to nominal damages, his due process claim should be dismissed.

be **DISMISSED** from this action. His claims for excessive force against Detective Morris and the Doe agents, however, are approved for service on Detective Morris,[9] and the Clerk is **DIRECTED** to forward a copy of this Order, along with Harris' Complaint, to the Marshal for service upon these defendants so that they may respond to his excessive force claims.

Meanwhile, it is time for Harris to pay his filing fee. His PLRA paperwork reflects $16.67 in average monthly deposits. Doc. 4. He therefore owes a $3.33 initial partial filing fee. *See* 28 U.S.C. § 1915(b)(1) (requiring an initial fee assessment "when funds exist," under a specific 20 percent formula). Harris' custodian (or designee) shall remit the $5.16 and shall set aside 20 percent of all future deposits to his account, then forward those funds to the Clerk each time the set aside amount reaches $10.00, until the balance of the Court's $350.00 filing fee has been paid in full.

The Clerk is **DIRECTED** to send this Report and

---

[9] Once that defendant is served and has responded to the Complaint, Harris may use the appropriate discovery mechanisms to identify the Doe agents. *See* Fed. R. Civ. P. 5(b) (describing procedure for service of discovery). In addition, Harris is apprised that neither the Court nor the United States Marshal Service is needed for this purpose, and discovery requests are *not* filed with the Court. *See, e.g.*, Fed. R. Civ. P. 5(d) (initial disclosures and discovery requests/responses are *not* filed until they are used for a motion or the court orders them to be filed).

Recommendation (R&R) to Harris' account custodian immediately, as this payment directive is nondispositive within the meaning of Fed. R. Civ. P. 72(a), so no Rule 72(b) adoption is required. In the event he is transferred to another institution, his present custodian shall forward a copy of this R&R and all financial information concerning payment of the filing fee and costs in this case to Harris' new custodian. The balance due from Harris shall be collected by the custodian at his next institution in accordance with the terms of the payment directive portion of this R&R.

This R&R is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The

district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this 16th day of July, 2018.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA